## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**MARKET SYNERGY GROUP, INC.,**

        **Plaintiff,**

**v.**

        **Case No. 16-CV-4083-DDC-KGS**

**UNITED STATES DEPARTMENT OF
LABOR, et al.,**

        **Defendants.**

## MEMORANDUM AND ORDER

This matter comes before the court on plaintiff's Motion for Preliminary Injunction (Doc. 10).  Defendants submitted an Opposition to plaintiff's motion (Docs. 25, 41-1 (corrected version)), and plaintiff filed a Reply (Doc. 36).  On September 21, 2016, the court conducted a hearing on the motion.  Afterwards, the parties submitted supplemental briefing (Docs. 52, 53). After considering the parties' submissions and arguments, the court now is prepared to rule.  For reasons explained below, the court denies plaintiff's Motion for Preliminary Injunction.

### I.    Introduction

Plaintiff Market Synergy Group, Inc. brings this lawsuit under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, and the Regulatory Flexibility Act of 1980, 5 U.S.C. § 601 *et seq.*, challenging a final regulatory action taken by the Department of Labor ("DOL") on April 8, 2016.  With its Motion for Preliminary Injunction, plaintiff asks the court to issue an order under Fed. R. Civ. P. 65 that preliminarily enjoins the DOL from taking any action to adopt or enforce the DOL's Amendment to and Partial Revocation of Prohibited Transaction Exemption

("PTE") 84-24,[1] as it applies to fixed indexed annuity ("FIA") sales.  Plaintiff further seeks an order requiring that PTE 84-24, as it existed before the DOL's April 8, 2016 amendment and partial revocation, remain in effect during the pendency of this litigation.  Unless the court orders the requested injunctive relief, PTE 84-24 will apply to transactions occurring on or after April 10, 2017.[2]

PTE 84-24 provides regulatory relief to insurance agents and others who, according to the DOL's new regulatory definition, are "fiduciaries" and who receive compensation from third parties in connection with transactions involving an ERISA[3] plan or individual retirement account ("IRA").  Unless an exemption like PTE 84-24 applies, ERISA and the IRS Code[4] prohibit fiduciaries from receiving third-party compensation.  With the new rule, the DOL revoked PTE 84-24's exemption of annuity contracts that do not satisfy the DOL's newly created definition of a "Fixed Rate Annuity Contract."  In doing so, the DOL specifically excluded FIAs from the PTE 84-24 exemption.

The parties have conflicting views about the purpose and effects of the DOL's amendment to PTE 84-24.  Plaintiff asserts that the rule change will have grave consequences for its business.  Plaintiff describes its business model as one depending heavily on its ability to receive compensation generated from FIA sales.  Plaintiff estimates that its revenue will decline

---

[1]     Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies, and Investment Company Principal Underwriters, 81 Fed. Reg. 21,147 (Apr. 8, 2016) (to be codified at 29 C.F.R. pt. 2550) ["Final PTE 84-24"].

[2]     *Id.* at 21,171 (stating that the DOL determined that "an Applicability Date of April 10, 2017, is appropriate for plans and their affected financial services and other service providers to adjust to" the rule change).

[3]     Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*

[4]     The Internal Revenue Code of 1986, as amended ("the IRS Code"), 26 U.S.C. § 1 *et seq.*

by almost 80% under the amended version of PTE 84-24 because the rule change prohibits plaintiff and others affiliated with it from receiving third-party compensation for FIA sales. Plaintiff also anticipates that the independent market organizations ("IMOs") and insurance agents that it works with to distribute FIAs will experience significant revenue losses. And, plaintiff forecasts that more than 20,000 independent insurance agents will exit the marketplace if the rule change takes effect.

Plaintiff also complains that the DOL lacked a sufficient basis to remove FIAs from the exemption in PTE 84-24 when it allowed other types of fixed annuities to remain under the exemption. Plaintiff contends that other types of transactions that still enjoy exemption under the amended version of PTE 84-24 are indistinguishable from FIAs and present no different risks or conflicts of interest compared to FIAs.

The DOL responds that the rule change is necessary to protect consumers. The DOL asserts that FIAs are complex transactions that involve significant conflicts of interest at the point of sale. Because of these characteristics, the DOL contends that FIA sales require more stringent rules governing the payment of third-party compensation, and thus should not enjoy exemption under PTE 84-24.

To reach the decision announced in this Order, the court need not decide whether the DOL's amendment to PTE 84-24 is appropriate given the DOL's consumer protection concerns. It also need not question whether the DOL's amendment is improper because it imposes significant challenges to plaintiff's business model. Instead, because this lawsuit challenges the DOL's action under the Administrative Procedure Act and Regulatory Flexibility Act of 1980, the court must determine whether plaintiff is likely to succeed on the merits of its claim that the DOL failed to follow the appropriate procedures in exacting the rule changes. The court

concludes below that plaintiff is not likely to succeed on the merits of this claim. And, thus, plaintiff is not entitled to the injunctive relief that it seeks by its motion.

## II.    Factual Background

### *Plaintiff Market Synergy Group, Inc.*

Plaintiff is a Kansas corporation and a licensed insurance agency based in Topeka, Kansas. Plaintiff works with insurance companies to develop specialized, proprietary FIAs and other insurance products for exclusive distribution. It partners with IMOs to distribute these products. About 3,000 agents and other financial professionals sell proprietary products developed through plaintiff's relationships with insurance companies.

Plaintiff also conducts market research and provides training and product support for IMO network members and the independent insurance agents who IMOs recruit. Plaintiff describes its business as dependent upon the viability of the IMO/independent insurance agent distribution channel for sales of FIAs and other fixed insurance products.

Plaintiff distributes FIAs and other insurance products through 11 IMO network members. These IMO network members are independently owned insurance wholesalers that assist independent agents and financial advisers who aspire to increase their life insurance and annuity business. About 20,000 individual agents work with the 11 IMOs in plaintiff's network. In 2015, plaintiff and its network members collectively generated about $15 billion of FIA sales, measured by premiums paid. Nationwide, about 80,000 independent insurance agents are engaged in the sale of FIAs.

### *The Different Types of Annuities*

Annuities are retirement investments sold by life insurance companies. All annuities have one common feature—that is, with an annuity, an insurance company promises to pay

income on a regular basis for an agreed period of time.  The annuity contract may provide for immediate or deferred payments.  A "deferred" annuity has two phases.  The first, called the "accumulation" or "deferral" phase, occurs when the contract accrues value through the purchaser's payment of premiums and credited interest.   The second, called the "payout" phase, occurs when the insurance company pays the purchaser a stream of payments based on a designated payment option.  The three most common types of deferred annuities are:  (1) declared rate annuities, (2) FIAs (fixed indexed annuities), and (3) variable annuities.

The first type of annuity—a declared rate annuity—provides a guaranteed minimum interest rate during the accumulation phase.  The insurance company establishes a specific interest rate, normally on an annual basis, which may be above but cannot be below the guaranteed minimum interest rate.   With a declared rate annuity, the insurance company bears the investment risk because it guarantees that the annuity will earn the declared interest rate for the upcoming year (or other period as specified in the annuity contract).  When the declared rate annuity reaches the payout phase, the insurance company makes annuity income payments that are based on the payment rates guaranteed at the time the annuity was issued (or the insurer's current payment rates, if higher) and are guaranteed for the selected payout duration.

The second type of annuity is an FIA.[5]  An FIA earns credited interest based on positive changes in a market index, such as the Dow Jones Industrial Average, Nasdaq 100 Index, or Standard & Poor's 500 Index.  The purchaser's annuity premiums are not invested in index funds.  Instead, the market index's performance is used simply as a reference to determine the amount of credited interest under the specified index crediting method.  So, depending on the performance of the specific market index, a FIA may produce much higher or lower returns than

---

[5]      This is the type of annuity that the DOL's final rule excludes from the PTE 84-24 exemption, a decision that plaintiff challenges and is the subject of this lawsuit.

the guaranteed rate of return offered by a declared rate annuity.  But, the crediting rate is guaranteed never to fall below zero, even if the market goes down and the index is net negative for the crediting period.  Thus, the principal is protected from market downturns.  Both declared rate annuities and FIAs are governed by state insurance laws, and they are exempt from federal securities laws.

The third type of annuity is a variable annuity.  Variable annuities differ from the other two types of annuities in that they do not have guaranteed returns.  Variable annuities are securities whose investment returns vary depending on the value of the assets in which their funds are invested.  Variable annuities earn investment returns and are exposed to losses based on the performance of the investment.  Variable annuities are regulated by the federal securities laws.

### *How FIAs Are Sold*

Insurance companies generally do not recruit independent insurance agents to sell their products.  Instead, IMOs recruit independent insurance agents to sell FIAs and other types of insurance products to the independent agents' clients.  An IMO serves as a third-party intermediary between the agents and the insurance companies, providing product education, marketing, and distribution services.  Insurance companies generally compensate IMOs for their support services based on a percentage of agent sales volume.

IMOs and their networks of independent insurance agents constitute the largest overall distribution channel for FIAs.  In 2015, about 65% of FIAs were sold by independent insurance agents who were not affiliated with a broker-dealer.  FIAs also represent a significant portion of a typical IMO's independent agent's sales.  For agents within plaintiff's IMO network, FIAs

6

represent more than 90% of all sales.  Similarly, plaintiff attributes 100% of its 2015 revenue, in some fashion, to developing, marketing, or distributing FIAs.

### The DOL Proposed Rulemaking

On April 20, 2015, the DOL issued a new proposed rule redefining who is a "fiduciary" of an employee benefit plan under ERISA and the IRS Code.  *See* Definition of the Term "Fiduciary"; Conflict of Interest Rule—Retirement Investment Advice, 80 Fed. Reg. 21,928 (proposed Apr. 20, 2015) ["2015 Proposed Fiduciary Definition"].  The DOL explained that the new rule, if adopted, "would treat persons who provide investment advice or recommendations to an employee benefit plan, plan fiduciary, plan participant or beneficiary, IRA, or IRA owner as fiduciaries under ERISA and the [IRS] Code in a wider array of advice relationships than the existing ERISA and [IRS] Code regulations, which would be replaced."  *Id.* at 21,928.  As such, the proposed rule would subject sellers of financial products to a new set of regulatory standards.

The DOL also explained that it was "proposing new exemptions and amendments to existing exemptions from the prohibited transaction rules applicable to fiduciaries under ERISA and the [IRS] Code."  *Id.*  The exemptions "would allow certain broker-dealers, insurance agents and others that act as investment advice fiduciaries to continue to receive a variety of common forms of compensation that otherwise would be prohibited as conflicts of interest."  *Id.*

To that end, the DOL proposed a new exemption called the Best Interest Contract Exemption ("BICE").  *Id.* at 21,929; *see also* Proposed Best Interest Contract Exemption, 80 Fed. Reg. 21,960 (proposed Apr. 20, 2015) ["2015 Proposed BICE"].  As the DOL explained, the BICE "would allow certain investment advice fiduciaries, including broker-dealers and insurance agents, to receive these various forms of compensation that, in the absence of an exemption, would not be permitted under ERISA and the [IRS] Code."  2015 Proposed BICE, 80

Fed. Reg. at 21,961.  But, the BICE would impose a more stringent set of requirements on prohibited transactions than those required under PTE 84-24.

To apply, the BICE would require a "Financial Institution" (as defined in the proposed BICE) and the adviser to acknowledge fiduciary status by contract, to commit to adhere to basic standards of impartial conduct, including a duty to act in the customer's "best interest" and receive no more than "reasonable compensation," to adopt policies and procedures reasonably designed to minimize the effect of conflicts of interest, and to disclose basic information about their conflicts of interest and the cost of their advice.  *Id.* at 21,961, 21,969–72.  The BICE would apply to fiduciaries providing investment advice for all types of insurance and annuity contracts as well as other investment products.  *Id.* at 21,984, 21,987.

The DOL also proposed to amend and revoke parts of the existing PTE 84-24 exemption. *See* Proposed Amendment to and Proposed Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies and Investment Company Principal Underwriters, 80 Fed. Reg. 22,010 (Apr. 20, 2015) ["2015 Proposed PTE 84-24"].  The DOL explained that the existing PTE 84-24 includes an "exemption permit[ting] insurance agents, insurance brokers and pension consultants that are parties in interest or fiduciaries with respect to plans and IRAs to effect the purchase of the insurance or annuity contracts for the plans or IRAs and receive a commission on the sale."  *Id.* at 22,012.  The existing PTE 84-24 also provides an exemption for "the prohibited transaction that occurs when the insurance company selling the insurance or annuity contract is a party in interest or disqualified person with respect to the plan or IRA."  *Id.* The proposal noted that, under the existing PTE 84-24, the term "insurance and annuity contract" included variable annuities.  *Id.* at 22,013.

The DOL proposed an amendment to PTE 84-24 that "would revoke relief for insurance agents, insurance brokers and pension consultants to receive a commission in connection with the purchase by IRAs of variable annuity contracts and other annuity contracts that are securities under federal securities laws and for mutual fund principal underwriters to receive a commission in connection with the purchase by IRAs of mutual fund shares." *Id.* at 22,012. Instead of relying on PTE 84-24 as an exemption to the rules prohibiting third-party compensation, the DOL proposed that fiduciaries selling the described investment products must seek an exemption under the BICE. *Id.* The DOL proposed this change because it "believes that the provisions in the [BICE] better protect the interests of IRAs with respect to investment advice regarding securities products." *Id.*

The DOL's proposal specifically limited the revocation of relief in PTE 84-24 to "transactions involving variable annuity contracts and other annuity contracts that are securities under federal securities laws, and mutual fund shares." *Id.* at 22,014. The DOL explained that "this proposal would revoke relief in PTE 84-24 for such transactions." *Id.* The DOL went on to explain: "On the other hand, the [DOL] has determined that transactions involving insurance and annuity contracts that are not securities can continue to occur under this exemption, with the added protections of the Impartial Conduct Standards." *Id.* at 22,015. The DOL reasoned that the different treatment was appropriate because:

> In this proposal, therefore, the [DOL] has distinguished between transactions that involve securities and those that involve insurance products that are not securities. The [DOL] believes that annuity contracts that are securities and mutual fund shares are distributed through the same channels as many other investments covered by the [BICE], and such investment products all have similar disclosure requirements under existing regulations. In that respect, the conditions of the proposed [BICE] are appropriately tailored for such transactions.

*Id.*

After explaining the rule that it had proposed, the DOL noted its uncertainty whether the

BICE would apply to insurance and annuity contracts that are not securities.  It stated:

> The [DOL] is not certain that the conditions of the [BICE], including some of the disclosure requirements, would be readily applicable to insurance and annuity contracts that are not securities, or that the distribution methods and channels of insurance products that are not securities would fit within the exemption's framework.  While the [BICE] will be available for such products, the [DOL] is seeking comment in that proposal on a number of issues related to use of that exemption for such insurance and annuity products.
>
> The [DOL] requests comment on this approach.  In particular, the [DOL]  requests comment on whether the proposal to revoke relief for securities transactions involving IRAs (i.e., annuities that are securities and mutual funds) but leave in place relief for IRA transactions involving insurance and annuity contracts that are not securities strikes the appropriate balance and is protective of the interests of the IRAs.

*Id.*

The DOL also requested public comment about this topic in the proposed rule for the

BICE.  The DOL explained that it "has determined that PTE 84-24 should remain available for

investment advice fiduciaries to receive commissions for IRA (and plan) purchases of insurance

and annuity contracts that are not securities."  2015 Proposed BICE, 80 Fed. Reg. at 21,975.  The

DOL asked the public to "comment on this approach" and stated:

> In particular, we ask whether we have drawn the correct lines between insurance and annuity products that are securities and those that are not, in terms of our decision to continue to allow IRA transactions involving non-security insurance and annuity contracts to occur under the conditions of PTE 84-24 while requiring IRA transactions involving securities to occur under the conditions of this proposed [BICE].

*Id.*

The DOL described its uncertainty about "whether the disclosure requirements proposed herein are readily applicable to insurance and annuity products that are not securities" and "whether the distribution methods and channels of insurance products that are not securities fit within this exemption's framework." *Id.* So, "to evaluate [its] approach," the DOL sought "public comment [about] the current disclosure requirements applicable to insurance and annuity contracts that are not securities." *Id.* Also, the DOL questioned whether the BICE "can be revised with respect to such non-securities insurance and annuity contracts to provide meaningful information to investors as to the costs of such investments and the overall compensation received by Advisers and Financial Institutions in connection with the transactions?" *Id.*

The DOL also requested "information on the distribution methods and channels applicable to insurance and annuity products that are not securities" and asked commenters to provide information about "common structures of insurance agencies." *Id.* And, it questioned "whether any conditions of this proposed [BICE], other than the disclosure conditions discussed above, would be inapplicable to non-security insurance and annuity products?" Finally, it asked if "any aspects of this exemption [are] particularly difficult for insurance companies to comply with?" *Id.*

### *Regulatory Impact Analysis*

As part of its proposed rulemaking in 2015, the DOL issued on its website a Regulatory Impact Analysis of fiduciary investment advice. *See* Dep't of Labor, Fiduciary Investment Advice: Regulatory Impact Analysis (Apr. 14, 2015), http://www.dol.gov/ebsa/pdf/conflictsofinterestria.pdf. The DOL described its analysis as "an in-depth economic assessment of current market conditions and the likely effects of reform." *Id.* at 6. In conducting its analysis, the DOL reviewed various economic evidence including

"statistical analyses of investor results in conflicted investment channels, experimental studies, government reports documenting abuse, and economic theory on the dangers posed by conflicts of interest." *Id.* at 75–94, 137, 140, 235.  The analysis concluded that widespread conflicts of interest were causing harm to retirement investors. *Id.* at 8–9, 99–100, 235–36.  It also determined that the 2015 proposal would produce large financial gains for IRA and plan investors as well as other important economic benefits, easily justifying the compliance costs of the rule change. *Id.*

### *Public Comment and Hearing*

The DOL initially provided a 75-day comment period, ending on July 6, 2015. Definition of the Term "Fiduciary"; Conflict of Interest Rule—Retirement Investment Advice, 81 Fed. Reg. 20,946, 20,958 (Apr. 9, 2016) ["Final Fiduciary Definition"].  But, later, the DOL extended the comment period to July 21, 2015, to allow interested persons the opportunity to comment on the new proposal and proposed related exemptions. *Id.*  The DOL held a public hearing from August 10 to 13, 2015, in Washington D.C. *Id.*  More than 75 speakers testified at this four-day hearing. *Id.*  The DOL published the hearing transcript on its website on September 8, 2015, and provided another opportunity to comment on the proposed regulation, exemptions, and hearing transcript until September 24, 2015. *Id.*  The DOL received more than 3,000 individual comment letters and more than 30,000 submissions as part of 30 separate petitions on the proposal. *Id.*  These comments and petitions "came from consumer groups, plan sponsors, financial services companies, academics, elected government officials, trade and industry associations, and others, both in support of, and in opposition to, the proposed rule and proposed related exemptions." *Id.*  The DOL also "held numerous meetings with interested stakeholders at

12

which the Regulatory Impact Analysis was discussed."   Regulatory Impact Analysis for Final

Rule and Exemptions 6 (Apr. 2016), https://www.dol.gov/ebsa/pdf/conflict-of-interest-ria.pdf.

The DOL received comments discussing whether the proposed terms of PTE 84-24 and

the BICE were appropriate for annuities, including FIAs.  The DOL also received comments

from groups representing FIA providers urging the DOL to maintain the portions of the proposed

rules that would allow advisers involved in FIA transactions to rely on the exemption in PTE 84-

24.  *See* Administrative Record[6] at AR042356–81, AR047030–41 (comments submitted by the

National Association for Fixed Annuities); AR042535–66, AR047074–78 (comments submitted

by the Indexed Annuity Leadership Council); *see also* AR060663–70 (testimony of Jim

Poolman, Executive Director of the Indexed Annuity Leadership Council, at the Aug. 12, 2015

hearing).

Other groups urged the DOL to treat variable annuities, FIAs, and declared annuities the

same, preferably in PTE 84-24.  *See*, *e.g.*, AR037545–58 (comments submitted by Voya

Financial); AR037743–95 (comments submitted by Chamber of Commerce); AR037928–34,

AR038206–22 (comments submitted by Securities Industry and Financial Markets Association);

AR040087–138 (comments submitted by Insured Retirement Institute); AR046885–92

(comments submitted by Prudential Financial, Inc.); AR041101–17, AR046919–27 (comments

submitted by Northwest Mutual Life Insurance Co.); AR041617–49 (comments submitted by

Allianz Life Insurance Co.); AR042412–49 (comments submitted by Guardian Life Insurance

Co.); AR046745–50 (Jackson National Life Insurance Co.); AR060340–41 (testimony of

Bradford Campbell, Chamber of Commerce, at the Aug. 11, 2015 hearing).

---

[6]      The parties filed the portions of the administrative record that they cite in their briefs on
September 16, 2016.  *See* Docs. 48, 48-1, 48-2, 48-3.

Still, other commenters asked the DOL to require advisers involved in FIA transactions to satisfy the conditions of the BICE, instead of PTE 84-24. *See* AR039093–96 (arguing in the comments submitted by the University of Miami School of Law Investor Rights Clinic that all types of annuities and life insurance products should come within the BICE, not PTE 84-24), AR039214–78, AR045696–753 (comments submitted by Ron Rhoades), AR046846–82 (comments submitted by Fund Democracy).

Plaintiff did not submit public comment to the DOL about the proposed rule changes.  It asserts that it "reli[ed] on the [DOL's] determination to continue to include non-security annuity products, including all forms of fixed annuities, within the scope of amended PTE 84-24" and "determined that it had no need to, and would not, submit a comment."  Doc. 11-1 at 11. Plaintiff interpreted the proposed rule as drawing "a line between variable annuities, which are securities, and fixed annuities which are not securities" and "so [plaintiff] had no reason to think the [DOL] would ultimately switch" FIAs out of the PTE 84-24 exemption and into the BICE in the final rulemaking.  *Id*.

### The DOL's Final Action

On April 8, 2016, the DOL published its final rule.  Final Fiduciary Definition, 81 Fed. Reg. 20,946 (Apr. 8, 2016).  That same day, the DOL also published the final BICE.  Best Interest Contract Exemption, 81 Fed. Reg. 21,002 (Apr. 8, 2016) ["Final BICE"].  And the DOL issued the final amendment to PTE 84-24.  Final PTE 84-24, 81 Fed. Reg. 21,147 (Apr. 8, 2016).

In the final version of amended PTE 84-24, the DOL created a new defined term that did not appear in the notice of proposed rulemaking.  The new term, "Fixed Rate Annuity Contract," expressly excludes FIAs from the exemption provided under PTE 84-24.  *Id.* at 21,174, 21,176– 77 ("A Fixed Rate Annuity Contract does not include a variable annuity or an indexed annuity or

14

similar annuity."). Thus, under the final rule, fiduciaries providing investment advice cannot rely on PTE 84-24 to permit them to receive third-party compensation in connection with purchases of FIA products. Instead, fiduciaries must satisfy the conditions of the BICE to enjoy exemption from the prohibition against third-party commissions that would otherwise apply under ERISA and the IRS Code. *Id.* at 21,153.

The DOL described the differences it perceived between FIAs and other types of fixed annuities. The DOL explained that it decided to leave other types of fixed annuities within PTE 84-24 because they "provide payments that are the subject of insurance companies' contractual guarantees and that are predictable." *Id.* at 21,152. The DOL concluded that leaving such transactions in PTE 84-24 "will promote access to these annuity contracts which have important lifetime income guarantees and terms that are more understandable to consumers." *Id.* But, the DOL revoked the exemption for FIAs because it concluded: "These investments typically require the customer to shoulder significant investment risk and do not offer the same predictability of payments as Fixed Rate Annuity Contracts." *Id.* at 21,152–53. The DOL explained that FIAs are "often quite complex and subject to significant conflicts of interest at the point of sale" and, thus, as the DOL determined, "should be sold under the more stringent conditions of the [BICE]." *Id.*

The DOL acknowledged that some commenters had asserted that no meaningful distinction exists between FIAs and other types of fixed annuities:

> In this regard, some industry commenters focused on indexed annuities, in particular. These commenters asserted that [FIAs] and fixed annuities are identical insurance products except for the method of calculating interest credited to the contract. They said that indexed annuities are treated the same as other fixed annuities under state insurance law and federal securities law, and stated that indexed annuities can offer the same income, insurance and contractual guarantees as fixed annuities. Moreover, some

> commenters noted that significant investment risk is borne by the insurer and there is no risk of principal loss, assuming that the investor does not incur surrender charges. According to some commenters, indexed annuities are no more complex than other fixed annuities, and there are no different conflicts of interest created with their sales, as compared to fixed annuities.

*Id.* at 21,157.

The DOL also acknowledged that "like Fixed Rate Annuity Contracts, indexed annuities are generally not regulated as registered securities under federal securities laws" and that the Dodd-Frank Wall Street Reform and Consumer Protection Act "calls for certain annuity contracts to be considered exempt securities by the SEC if the conditions of that section are met." *Id.* at 21,156. Still, the DOL recognized that other commenters urged the DOL to remove FIAs from PTE 84-24 and subject them to the BICE's more stringent requirements. The DOL described these comments in this manner:

> [S]ome commenters argued that due to their complexity, fee structure, inherent conflicts of interest, as well as lack of regulation under the securities laws, indexed annuities similarly require heightened regulation. Consistent with this position, commenters argued that indexed annuities should be treated the same as variable annuities under the [DOL's] exemptions. Additionally, one commenter noted that the compensation structure for indexed annuities is similar to that of variable annuities, raising comparable concerns regarding conflicts of interest. As a result, commenters said that recommendations of such products by fiduciaries should be subject to the same protective conditions as those proposed for variable annuities under the [BICE].

*Id.* at 21,156.

The DOL explained that "[a]fter consideration of all of the comments," it decided to limit the scope of covered annuity contracts under PTE 84-24 "to plan and IRA transactions involving Fixed Rate Annuity Contracts." *Id.* at 21,157. It described the amended version of PTE 84-24 as "a streamlined exemption for relatively straightforward guaranteed lifetime income products

such as immediate and deferred income annuities." *Id.* And, the DOL explained that it had decided to omit "coverage of variable annuity contracts, indexed annuity contracts, and similar annuity contracts" under PTE 84-24 and instead made them subject to the requirements of the BICE "[b]ased upon its significant concerns about the complexity, risk, and conflicts of interest associated with recommendations of variable annuity contracts, indexed annuity contracts and similar contracts." *Id.*

So, under the final version of the rule, fiduciaries providing investment advice for FIAs, who wish to obtain third-party compensation for sales of those products, must operate under the BICE. To do so, the "Financial Institution" that employs or partners with the investment advice fiduciary must acknowledge its fiduciary status and adhere to enforceable standards of fiduciary conduct and fair dealing with respect to the investment advice. Final BICE, 81 Fed. Reg. at 21,003. Generally, the BICE requires a "Financial Institution" to do the following:

- Acknowledge fiduciary status with respect to investment advice to the Retirement Investor;

- Adhere to Impartial Conduct Standards requiring them to:

  ○ Give advice that is in the Retirement Investor's Best Interest (i.e., prudent advice that is based on the investment objectives, risk tolerance, financial circumstances, and needs of the Retirement Investor, without regard to financial or other interests of the Adviser, Financial Institution, or their Affiliates, Related Entities or other parties);

  ○ Charge no more than reasonable compensation; and

  ○ Make no misleading statements about investment transactions, compensation, and conflicts of interest;

- Implement policies and procedures reasonably and prudently designed to prevent violations of the Impartial Conduct Standards;

- Refrain from giving or using incentives for Advisers to act contrary to the customer's best interest; and

- Fairly disclose the fees, compensation, and Material Conflicts of Interest, associated with their recommendations.

*Id.* at 21,007.  When providing investment advice for IRAs and plans not covered by Title I of ERISA, the BICE requires the "Financial Institution" to enter into a written contract with the investor that includes the first three and final one of the provisions described above.  *Id.* at 21,020.  The BICE also requires the "Financial Institution" to disclose "whether or not they will monitor the Retirement Investor's investments and alert the Retirement Investor to any recommended changes to those investments and, if so, the frequency with which the monitoring will occur and the reasons for which the Retirement Investor will be altered."  *Id.* at 21,019.

When deciding the scope of the term "Financial Institutions," the DOL considered whether to include "marketing or distribution affiliates and intermediaries" and "entities within an insurance group that arrange for the marketing of financial products" in the BICE's definition of "Financial Institution."  *Id.* at 21,067.  The DOL declined to expand the definition to include "such intermediaries" but "made provision to add entities to the definition of Financial Institution through the grant of an individual exemption."  *Id.*  To meet the individual exemption under BICE, an entity "can submit an application to the [DOL] . . . with information regarding their role in the distribution of financial products, the regulatory oversight of such entities, and their ability to effectively supervise individual Advisers' compliance with the terms of this exemption."  *Id.*  If the DOL grants the individual exemption, the entity qualifies as a "Financial Institution" under BICE's definition.  *Id.* at 21,083 ("'Financial Institution' means . . . [a]n entity that is described in the definition of Financial Institution in an individual exemption granted by

the Department . . . , after the date of this exemption, that provides relief for the receipt of

compensation in connection with investment advice provided by an investment advice fiduciary,

under the same conditions as this class exemption.").

### *Regulatory Impact Analysis*

When the DOL published the new rules in April 2016, it also issued the final Regulatory

Impact Analysis of the final rule and exemptions.  AR000304–698.  This analysis found "that

conflicted [fiduciary investment] advice is widespread, causing serious harm to plan and IRA

investors, and that disclosing conflicts alone would fail to adequately mitigate the conflicts or

remedy the harm."  AR000324.  The final Regulatory Impact Analysis specifically addressed

FIAs.  *Id.*  It described them as products that "blend limited financial market exposures with

minimum guaranteed values."  *Id.*  The DOL recognized that FIAs "can play a beneficial and

important role in retirement preparation," but "public comments and other evidence demonstrate

that these products are particularly complex, beset by adviser conflicts, and vulnerable to abuse."

*Id.*

The DOL concluded the rule changes were necessary to "mitigate conflicts, support

consumer choice, and deliver substantial gains for retirement investors and economic benefits

that more than justify the costs."  *Id.*  To support its findings, the final Regulatory Impact

Analysis cited a "wide body of economic evidence" demonstrating that "conflicts of interest on

retirement investment outcomes is large and negative."  *Id.*  The DOL's review of the evidence

"suggest[ed] that IRA holders receiving conflicted investment advice can expect their

investments to underperform by an average of 50 to 100 basis points per year over the next 20

years."  AR000325.  And, this underperformance in the mutual funds segments alone "could cost

IRA investors between $95 billion and $189 billion over the next 10 years and between $202

billion and $404 billion over the next 20 years." *Id.*  The DOL also noted that these losses, though large, "represent only a portion of what retirement investors stand to lose as a result of adviser conflicts" because they "pertain only to IRA investors' mutual fund investments" and thus reflected "only one of the multiple types of losses that conflicted advice provides." *Id.*

The DOL anticipated that the new rules and exemptions could rectify these concerns about underperformance and instead produce investor gains.  Specifically, the DOL estimated that "gains to IRA front-end-load mutual fund investors alone will be worth between $33 billion and $36 billion over 10 years and between $66 billion and $76 billion over 20 years." AR000413; *see also* AR000483.  In addition to these gains, the DOL recognized that the rule changes also could include "a broad array of potential additional gains to investors and social benefits." AR000413.  The DOL concluded that the rule change would produce benefits that justify the costs associated with implementing them. *Id.*

Specific to the annuity market, the DOL recognized that conflicts of interest "can be more pronounced than the mutual fund market because commissions in the annuity market . . . are generally higher than commissions earned in connection with the recommendation of mutual funds." AR000484.  The DOL cited research suggesting that this commission structure "incentivizes insurance agents to steer consumers toward insurance products with higher commissions" which "may have led consumers to purchase annuities that were not in their best interest." *Id.*  The DOL was not able to quantify the gains because it lacked sufficient data, but it concluded that the rule change "is expected to create benefits in the annuity market by enhancing efficiencies through better matches between consumers and the annuity product." *Id.*

The DOL estimated that the costs required for compliance with the final rule and exemptions "will be between $10.0 billion and $31.5 billion over 10 years with a primary

estimate of $16.1 billion." AR000326. The DOL examined the BICE's compliance costs specific to insurers. AR000553. The DOL predicted that insurers would incur costs similar to broker-dealers since they would have to perform the same tasks to comply with the rule changes, even though they sell different products. *Id.* The DOL thus used the same data that it used to determine broker-dealers' costs to estimate the costs to insurers to comply with the rule changes. AR000554 fig. 5-11; *see also* AR000564–66. The DOL also assessed the costs to annuity providers of complying with the BICE instead of PTE 84-24 for FIA transactions. AR000578–79, AR000601–02.

The final Regulatory Impact Analysis also discussed the requirements of the Regulatory Flexibility Act. AR000570–76. Attempting to satisfy those requirements, the DOL described the rule's impact on small entities and how the agency made its decisions to apply the rule to small entities, as the Regulatory Flexibility Act requires. *Id.* The DOL considered 99.3% of all insurers as small entities under the Small Business Administration's definition. AR000571. It then analyzed the costs that these insurers would incur under the rule change, and it discussed the changes made to the rule that were intended to reduce those costs. AR000571–76. The DOL recognized the "possib[ility] that some small service providers may find that the increased costs associated with ERISA fiduciary status outweigh the benefit of continuing to service the ERISA plan market or the IRA market." AR000574. But the DOL "does not believe that this outcome will be widespread or that it will result in a diminution of the amount or quality of advice available to small or other retirement savers, because some firms will fill the void and provide services to the ERISA plan and IRA market." *Id.* The DOL also considered the "possib[ility] that the economic impact of the rule on small entities would not be as significant as it would be

for large entities, because anecdotal evidence indicates that small entities do not have as many business arrangements that give rise to conflicts of interest." *Id.*

### *Applicability Dates*

As stated above, the DOL has established an applicability date of April 10, 2017, for the rule changes and exemptions. Final Fiduciary Definition, 81 Fed. Reg. at 20,992–93. The DOL concluded that "one year after publication of the final rule in the Federal Register is adequate time for plans and their affected financial services and other service providers to adjust to the basic change from non-fiduciary to fiduciary status." *Id.* at 20,993.

The DOL also included an additional nine-month transition period after the April 10, 2017 applicability date for the industry to meet the requirements of BICE. Final BICE, 81 Fed. Reg. at 21,069. The DOL established a "Transition Period" beginning on the applicability date (April 10, 2017) and ending on January 1, 2018, which is "intended to give Financial Institutions and Advisers time to prepare for compliance with the conditions of [the BICE] while safeguarding the interests of Retirement Investors." *Id.* at 21,069. During the transition period, fiduciary investment advisers may rely on the BICE to receive third-party compensation for investment transactions if they adhere to certain standards of conduct and make certain disclosures. But, during the transition period, fiduciary investment advisers are not yet required to enter into a contract with investors or warrant affirmatively that they have adopted and will comply with the written policies that BICE requires. *Id.* at 21084–85.

### *Applications for Individual Exemptions Under BICE*

As explained above, the BICE includes a provision that allows an entity (such as plaintiff or one of its IMOs) to apply for an individual exemption that would bring the entity within the definition of "Financial Institution" and thus allow it to receive third-party compensation for

sales of investment products so long as it complies with the other requirements of the BICE. Final BICE, 81 Fed. Reg. at 21,002.  As of September 14, 2016, the Office of Exemption Determinations has received 10 applications for individual exemptions under the BICE.  *See* Declaration of Karen Lloyd ¶ 4 (Doc. 49-1 at 1).  All 10 applicants are IMOs seeking approval to serve as "Financial Institutions" under the BICE.  Three of these applicants are IMOs that are members of plaintiff's network:  (1) Financial Independence Group, (2) Brokers International, and (3) Advisors Excel.  *See* Doc. 25-1 at 90–106; *see also* Doc. 49-1 at 3–19, 38–57.  The Office of Exemption Determinations must process the applications following the DOL's regulations governing exemptions.  *See* 29 C.F.R. §§ 2570.30–2570.52.  These regulations authorize the DOL to grant exemptions when:

> following an evaluation of the facts and representations comprising the administrative record of the proposed exemption (including any comments received in response to a notice of proposed exemption and the record of any hearing held in connection with the proposed exemption), [the DOL] finds that the exemption is:
>
> > (1) Administratively feasible;
> >
> > (2) In the interests of the plan (or the Thrift Savings Fund in the case of FERSA) and of its participants and beneficiaries; and
> >
> > (3) Protective of the rights of participants and beneficiaries of such plan (or the Thrift Savings Fund in the case of FERSA).

29 C.F.R. § 2570.48.

### *This Lawsuit*

In this lawsuit, plaintiff challenges the DOL's rulemaking.  It contends that the DOL has violated the Administrative Procedure Act and Regulatory Flexibility Act by issuing a final rule that amends and partially revokes PTE 84-24's coverage for FIA transactions and, instead,

requires them to comply with the BICE.  And, with its motion for preliminary injunction, plaintiff asks the court to stay the April 2017 applicability date for the amended version of PTE 84-24, pending final adjudication of the action's claims.

### III.   Legal Standard

Federal Rule of Civil Procedure 65(a) authorizes district courts to issue preliminary injunctions.  The relief afforded under this rule has a limited purpose—a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  To prevail on a motion for preliminary injunction, the movant must demonstrate that:  (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction, if issued, will not be adverse to the public interest.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016).

Whether to grant a preliminary injunction rests within the court's sound discretion. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). A preliminary injunction is an extraordinary remedy.  *Winter*, 555 U.S. at 24.  So, the right to relief must be "clear and unequivocal."  *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015) (quoting *Beltronics USA, Inc.*, 562 F.3d at 1070).  "In general, 'a preliminary injunction . . . is the exception rather than the rule.'"  *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)).

## IV.     Analysis

The court considers the four requirements for a preliminary injunction, in turn, below.  It finds that plaintiff has established none of the four.  The court thus concludes that plaintiff is not entitled to the extraordinary relief it seeks in a preliminary injunction.

### A.  Likelihood of Success on the Merits

Plaintiff asserts that the DOL's rulemaking violated the Administrative Procedure Act ("APA") and Regulatory Flexibility Act ("RFA").  The APA grants federal courts authority to review agency decisions.  *See* 5 U.S.C. § 702.  The reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," or "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (C), (D), & (E); *see also Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014) (explaining that agency action "must be reversed if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A)).  When a court applies the "arbitrary and capricious" standard of review under the APA, it "must 'ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made.'"  *Kobach*, 772 F.3d at 1197 (quoting *Aviva Life & Annuity Co. v. FDIC*, 654 F.3d 1129, 1131 (10th Cir. 2011)).

The Supreme Court describes the scope of review under this standard as "narrow," and it cautions that a court must not "substitute its judgment for that of the agency."  *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011) (citations and internal quotation marks omitted); *see also Kobach*, 772 F.3d at 1197 ("This [arbitrary and capricious] standard of review is very deferential to the agency's determination, and a presumption of validity attaches to the agency action such

that the burden of proof rests with the party challenging it." (citations and internal quotation marks omitted)).  Despite this deferential standard, a court's review still plays an important role by "ensuring that agencies have engaged in reasoned decisionmaking." *Judulang*, 132 S. Ct. at 483–84.  This standard requires a court to "assess, among other matters, whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 484 (citations and internal quotation marks omitted).

The RFA "requires all agencies, as part of the rulemaking process, to conduct a 'regulatory flexibility analysis' for their proposed rules." *State of Colorado ex rel. Colo. State Banking Bd. v. Resolution Tr. Corp.*, 926 F.2d 931, 947 (10th Cir. 1991) (quoting 5 U.S.C. §§ 603–04).  "In the analysis, the agency must evaluate how the proposed rule will affect small entities, consider alternatives that would 'minimize any significant economic impact of the rule on [such] entities,' and explain 'why each one of such alternatives was rejected.'" *Id.* (first quoting 5 U.S.C. § 604(a)(3); then citing 5 U.S.C. § 603(a), (c)).  When reviewing an agency's compliance with the RFA, the court is "'highly deferential' . . . to the substance of the analysis, particularly where an agency is predicting the likely economic effects of a rule." *Council for Urological Interests v. Burwell*, 790 F.3d 212, 227 (D.C. Cir. 2015) (quoting *Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 438 (D.C. Cir. 2013)).

Here, plaintiff asserts that the DOL violated the APA and RFA in four ways:  (1) the DOL failed to provide notice that it would remove FIAs from the scope of the exemption in PTE 84-24; (2) the DOL arbitrarily treated FIAs differently from all other fixed annuities; (3) the DOL failed to consider the detrimental effects of its actions on independent insurance agent distribution channels; and (4) the DOL exceeded its statutory authority by seeking to manipulate

26

the financial product market instead of regulating fiduciary conduct.  The court considers each of plaintiff's arguments below.

> **1.   Plaintiff is not likely to prove that the DOL provided insufficient notice that it would remove FIAs from the scope of PTE 84-24.**

Plaintiff asserts that the DOL gave no warning that it intended to remove FIAs from the scope of PTE 84-24 in its final rule making.  Plaintiff argues that the proposed rule stated that the DOL would revoke relief under PTE 84-24 only for "transactions involving variable annuity contracts and other annuity contracts that are securities under federal securities law, and mutual fund shares," but did not include FIAs in this proposal.  2015 Proposed PTE 84-24, 80 Fed. Reg. at 22,014; *see also* 2015 Proposed BICE, 80 Fed. Reg. at 21,975.  The DOL also stated in the proposed rule that "transactions involving insurance and annuity contracts that are not securities can continue to occur" under PTE 84-24, as they had under the existing rules.  2015 Proposed PTE 84-24, 80 Fed. Reg. at 22,015.  Plaintiff contends that it could not anticipate from this proposed language that the DOL was considering the removal of FIAs from PTE 84-24.  And, plaintiff asserts, this lack of notice deprived it of the opportunity to submit meaningful comments to the DOL about the proposed rule.

Defendants respond that the DOL gave proper notice because the decision to remove FIAs from PTE 84-24 "logically grew out of" the proposed rule that it issued.  Defendants assert that the DOL specifically raised the question whether the proposed rule "to revoke relief for securities transactions involving IRAs (i.e., annuities that are securities and mutual funds) but leave in place relief for IRA transactions involving insurance and annuity contracts that are not securities strikes the appropriate balance and is protective of the interests of the IRAs." *Id.* at 22,015.  Thus, defendants argue, this statement shows that the DOL was considering what types

of products to include and exclude from PTE 84-24.  And, defendants assert, this statement

should have made it apparent to plaintiff that the DOL was considering whether to remove FIAs

from the exemption.

The APA requires that an agency provide notice of proposed rulemaking, including

"either the terms or substance of the proposed rule or a description of the subjects and issues

involved."  5 U.S.C. § 553(b)(3).  After providing the requisite notice, the agency must "give

interested parties an opportunity to participate in the rulemaking through submission of" written

comments.  5 U.S.C. § 553(c).  After complying with the notice and comment requirement, an

agency need not provide a second opportunity for comment merely because it issues a final rule

that differs from the proposal.  *Kaw Valley, Inc. v. EPA*, 844 F. Supp. 705, 710 (D. Kan. 1994).

The Tenth Circuit has explained:  "It is a well settled and sound rule which permits

administrative agencies to make changes in the proposed rule after the comment period without a

new round of hearings."  *Beirne v. Sec'y of Dep't of Agric.*, 645 F.2d 862, 865 (10th Cir. 1981)

(citing *Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 293 (3d Cir. 1977)).  But this rule is not

without limits—any changes to a final rule must "be in 'character with the original scheme and

(be) foreshadowed in proposals and comments advanced during the rulemaking.'"  *Id.* (quoting

*S. Terminal Corp. v. EPA*, 504 F.2d 646, 658 (1st Cir. 1974)).

"The Courts of Appeals have generally interpreted [the APA notice and comment

requirement] to mean that the final rule the agency adopts must be 'a "logical outgrowth" of the

rule proposed.'"  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (quoting

*Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1022 (2d Cir. 1986) (further citations omitted));

*see also Am. Mining Cong. v. Thomas*, 772 F.2d 617, 639 (10th Cir. 1985) (holding that an

agency's final rule did not "represent a logical outgrowth from the proposed regulations").  "A

final rule is a logical outgrowth if affected parties should have anticipated that the relevant modification was possible." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107 (D.C. Cir. 2014) (citing *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009)). An agency's proposed rule "satisfies the logical outgrowth test if it 'expressly ask[s] for comments on a particular issue or otherwise ma[kes] clear that the agency [is] contemplating a particular change.'" *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 700 (D.C. Cir. 2016) (quoting *CSX Transp.*, 584 F.3d at 1081). Interpreting the APA's requirements, the Supreme Court has noted: "The object, in short, is one of fair notice." *Long Island Care at Home*, 551 U.S. at 174.

For reasons explained below, the court finds that plaintiff is not likely to show that the DOL failed to satisfy this standard under the APA. Instead, the administrative record shows that the APA provided fair notice of the proposed rule change.

### a. The language of the proposed rule was sufficient to put the public on notice of the final rulemaking.

At oral argument, plaintiff sifted through the language of the proposed rule, arguing that the DOL was silent in its proposed rulemaking about the possibility of removing FIAs from PTE 84-24. In the proposed rule, the DOL stated:

> As the [BICE] was designed for IRA owners and other investors that rely on fiduciary investment advisers in the retail marketplace, the [DOL] believes that some of the transactions involving IRAs that are currently permitted under PTE 84-24 should instead occur under the conditions of the [BICE], specifically, transactions involving variable annuity contracts and other annuity contracts that are securities under federal securities laws, and mutual fund shares. Therefore, this proposal would revoke relief in PTE 84-24 for such transactions. This change is reflected in a proposed new Section I(b), setting forth the scope of the exemption. On the other hand, the [DOL] has determined that transactions involving insurance and annuity contracts that are not securities can continue to occur under this exemption, with the added protections of the Impartial Conduct Standards.

2015 Proposed PTE 84-24, 80 Fed. Reg. at 22,014–15.  Plaintiff asserts that this language provides notice only that the DOL intended to remove transactions involving variable annuity contracts and other annuity contracts that are securities under the federal securities law and mutual funds.  Plaintiff also asserts that the DOL has determined that insurance and annuity contracts that are not securities will remain under PTE 84-24.  Since FIAs are not securities, plaintiff argues, it could not have anticipated that the DOL intended to remove them from PTE 84-24 because the above-cited passage only talks about the removal of annuities that are securities.

The DOL's proposed rule continues:

> In this proposal, therefore, the [DOL] has distinguished between transactions that involve securities and those that involve insurance products that are not securities.  The [DOL] believes that annuity contracts that are securities and mutual fund shares are distributed through the same channels as many other investments covered by the [BICE], and such investment products all have similar disclosure requirements under existing regulations.  In that respect, the conditions of the proposed [BICE] are appropriately tailored for such transactions.

*Id.* at 22,015.  Plaintiff argues that this provision explains that the BICE is the appropriate prohibited transaction exemption for securities transactions instead of PTE 84-24, but it makes no mention of including FIAs in the BICE as well.  And, again, because FIAs are not securities, plaintiff contends that it had no reason to anticipate that the DOL was considering a rule that treated FIAs as transactions subject to the BICE.  More specifically, the language discussed how annuity contracts that are securities are subject to similar regulations as the other investment products in the BICE and, so, it made sense for the DOL to include them in the BICE with those other investment products.  Plaintiff underscores that these products are regulated under the federal securities laws, unlike FIAs, which are governed by state insurance laws.

The DOL next explained in the proposed rule its uncertainty about how it categorized different types of transactions for inclusion in the BICE:

> The [DOL] is not certain that the conditions of the [BICE], including some of the disclosure requirements, would be readily applicable to insurance and annuity contracts that are not securities, or that the distribution methods and channels of insurance products that are not securities would fit within the exemption's framework. While the [BICE] will be available for such products, the [DOL] is seeking comment in that proposal on a number of issues related to use of that exemption for such insurance and annuity products.

*Id.* Plaintiff argues that this language merely addresses whether non-security annuity products are appropriate for inclusion in the BICE. Plaintiff contends that the proposed rule does not address whether the DOL should remove non-security annuity products from PTE 84-24, as the agency did in the final rule. The DOL ended its discussion of the scope of it rulemaking consideration with the following:

> The [DOL] requests comment on this approach. In particular, the [DOL] requests comment on whether the proposal to revoke relief for securities transactions involving IRAs (i.e., annuities that are securities and mutual funds) but leave in place relief for IRA transactions involving insurance and annuity contracts that are not securities strikes the appropriate balance and is protective of the interests of the IRAs.

*Id.* Again, plaintiff asserts that this provision provided no notice that the DOL was considering whether to remove FIAs from PTE 84-24.

The court disagrees. In this section, the DOL specifically requested public comments about whether its approach—leaving within the scope of PTE 84-24 "insurance and annuity contracts that are not securities"—is appropriate when the proposal revokes the relief afforded under PTE 84-24 for annuities that are securities and mutual funds. This language is sufficient to put the public on notice that the DOL was considering whether to remove from PTE 84-24 other

types of insurance and annuity products that are not securities—which would include FIAs.  The proposed rulemaking thus provided sufficient notice of "a description of the subjects and issues involved," to satisfy the APA's requirements.  5 U.S.C. § 553(b)(3); *see also United Steelworkers of Am. v. Schuylkill Metals Corp.*, 828 F.2d 314, 317–18 (5th Cir. 1987) (holding that an agency provided adequate notice when it sought comments about the appropriate scope of a proposed rule; the agency's "questions and descriptions more than adequately sufficed to apprise fairly an interested party that there was an issue regarding the breadth of" the proposed rule and "it certainly was not necessary that [the agency] spell out with particularly the proposed meaning of" a particular term within the proposed rule).

### b. Plaintiff's arguments against the court's reading of the proposed language fail to demonstrate insufficient notice.

Plaintiff asserts several reasons why, in its estimation, the DOL's proposed language provided insufficient notice of the DOL's final decision to remove FIAs from PTE 84-24.  The court addresses each argument below, but concludes none demonstrate that the DOL failed to provide sufficient notice of the final rulemaking.

First, plaintiff argues that the proposed language only referenced the BICE, but did not give notice that the DOL might alter PTE 84-24.  The court disagrees with plaintiff's reading of the proposed rule.  Although part of the proposal discussed the scope of the BICE, *see* 2015 Proposed PTE 84-24, 80 Fed. Reg. at 22,015 ("[T]he [DOL] is seeking comment . . . on a number of issues related to use of that exemption [i.e., the BICE] for [non-securities] insurance and annuity products."), the proposal also requested comment discussing whether it was appropriate to revoke relief under PTE 84-24 for annuities that are securities but "leave in place relief for IRA transactions involving insurance and annuity contracts that are not securities," *id.*

The proposed rule thus referenced, explicitly, whether the DOL should allow certain transactions to remain in PTE 84-24 while moving other types of transactions to the BICE.

Second, plaintiff argues that the above-quoted language merely questioned whether the DOL should remove annuities that are securities from PTE 84-24 and place them into the BICE. It did not raise, plaintiff contends, the possibility of removing other transactions (such as FIAs) from the scope of PTE 84-24.  Plaintiff's construction of the proposed language is far too narrow.  The proposed rule explicitly states that the DOL is seeking comments addressing whether the distinctions it has made between different types of transactions "strikes the appropriate balance and is protective of the interests of IRAs."  *Id.*  A plain reading of the proposed rule fairly apprised interested parties that the DOL was considering where to place non-securities annuities under the new rules—either within or outside the PTE 84-24 exemption.[7] The proposed rule provided sufficient notice under the APA.

Third, plaintiff asserts that the proposed language referenced only transactions involving IRAs, but not ERISA plans.  And yet, the final rule revoked relief under PTE 84-24 for FIAs involving both IRAs and ERISA plans.  2015 Proposed PTE 84-24, 80 Fed. Reg. at 22,015 (stating in the proposed rule that "the [DOL] requests comment on whether the proposal to revoke relief for securities transactions *involving IRAs* (i.e., annuities that are securities and mutual funds) but leave in place relief for *IRA transactions* involving insurance and annuity contracts that are not securities strikes the appropriate balance and is protective of the interests of

---

[7]     The District Court for the District of Columbia recently reached a similar conclusion.  In a related case challenging whether the DOL provided sufficient notice that it might remove FIAs from the scope of PTE 84-24, the District of Columbia court held that the DOL's notice was adequate.  *See Nat'l Ass'n for Fixed Annuities v. Perez*, __ F. Supp. 3d __, 2016 WL 6573480, at *34 (D.D.C. Nov. 4, 2016) (interpreting the DOL's proposed rule as "expressly request[ing] comment on its decision to 'continue to allow IRA transactions involving' [FIAs] 'to occur under the conditions of PTE 84-24,' while requiring that similar transactions involving variable annuities occur under the conditions contained in the proposed [BICE].  That is, it asked whether [FIAs] should be grouped under PTE 84-24 or not" (quoting 2015 Proposed BICE, 80 Fed. Reg. at 21,975)).

*the IRAs*." (emphasis added)).  At oral argument, defendants urged the court to reject this

argument because plaintiff did not plead this notice claim in its Complaint or in its opening brief.

*See N.H. Ins. Co. v. Westlake Hardware, Inc.*, 11 F. Supp. 2d 1298, 1301 n.1 (D. Kan. 1998)

(refusing to consider claims that plaintiff did not make in the complaint); *see also Liebau v.*

*Columbia Cas. Co.*, 176 F. Supp. 2d 1236, 1244–45 (D. Kan. 2001) (explaining that our court

generally refuses to consider new arguments first raised in a reply brief).

Even considering this argument, the court agrees with defendants that it is largely

irrelevant.  The record shows that FIAs are sold primarily through IRA transactions, not ERISA

plans.  *See* AR000433 fig. 3-9 (showing that, in 2014, only 2% of FIA sales involved ERISA

plans).  And, unlike IRA transactions, ERISA plans are governed by federal statutes that already

provide certain protections to investors.  For this reason, the DOL did not include them in the

contract requirement of the BICE.  *See* Final BICE, 81 Fed. Reg. at 21,008 ("The exemption

does not similarly require the Financial Institution to execute a separate contract with ERISA

investors (which includes plan participants, beneficiaries, and fiduciaries), but the Financial

Institution must acknowledge its fiduciary status and that of its advisers, and ERISA investors

can directly enforce their rights to proper fiduciary conduct under ERISA section 502(a)(2) and

(3).").  So, while the final rule revoked relief under PTE 84-24 for FIAs involving ERISA plans,

the BICE affords an exemption for these transactions under less onerous requirements than that

required for FIA transactions involving IRA transactions.  The proposed rule's reference only to

IRA transactions does not render the agency's notice insufficient under the APA.

And, finally, at oral argument, plaintiff asserted that the proposed rule fails to mention

the standards that the DOL ultimately used to determine whether to remove FIAs from PTE 84-

24.  Under this standard, the DOL considered the complexity, investment risk, and conflicted

sales practices of the transactions when deciding whether to remove them from PTE 84-24 and subject them to the requirements of the BICE.  Although these standards do not appear in the proposed rule, the governing legal principles do not require that level of detail to satisfy the APA's notice requirements.  *See Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985) (explaining that "a final rule need not be identical to the original proposed rule" because "[t]he whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different—and improved—from the rules originally proposed by the agency"; instead, "the question for the court is whether the final rule is a logical outgrowth of the rulemaking proceeding" (citations and internal quotation marks omitted)); *see also Schuylkill Metals Corp.*, 828 F.2d at 317–18 (holding it was not necessary for an agency to "spell out with particularity the proposed meaning" of the term in the proposed rule).

### c.   Other commenters anticipated the final rulemaking.

The DOL also received comments from other interested parties discussing whether FIAs should remain covered under PTE 84-24 or move into the BICE.  These comments demonstrate that other recipients of the DOL's notice discerned the possibility of changes that appeared in the final rule.  Their comments also support the conclusion that those changes were a logical outgrowth of the proposed rule.

For example, one commenter interpreted the proposed rule as "specifically request[ing] comment on which exemption, the [BICE] or a revised PTE 84-24, should apply to different types of annuity products."  AR041624 (comment from Allianz Life Insurance Company of North America).  Other commenters praised the DOL for keeping FIAs within the PTE 84-24 exemption and urged the DOL to let them remain there instead of moving them into the BICE.  *See*, *e.g.*, AR047030–31 (stating in a comment from the National Association for Fixed Annuities ("NAFA") that it "commends the [DOL] for recognizing that PTE 84-24 is the

appropriate regulatory exemption for non-security annuities—i.e., fixed annuities—under the proposed rule" because it will "encourage the purchase of fixed annuities for the risk-free growth of principal and lifetime income feature these products offer" but also expressing concern about the treatment of FIAs and urging the DOL to "continue to include [FIAs] as non-security annuities under the proposed modifications to PTE 84-24");[8] AR042540–41 (stating in a comment from the Indexed Annuity Leadership Council that it "appreciates the [DOL] retaining and modifying PTE 84-24 to provide an exemption" for "fixed annuities, *including fixed indexed annuities*" and, in response to the proposal's question whether "it has struck the right balance in terms of providing exemptions for securities and non-securities," urging the DOL to keep fixed annuities in PTE 84-24 instead of subjecting them to the requirements of the BICE (emphasis added)).

Moreover, one of the IMOs in plaintiff's network—Advisors Excel—submitted a comment stating that it "concur[s] with many of the concerns outlined in the Indexed Annuity Leadership Council's ("IALC") July 20, 2015, comment letter, and in the interest of brevity, will not revisit each of the points laid out in the IALC comments." AR051884. As cited above, the IALC's comment specifically addressed the DOL's question whether it had "struck the right balance" and argued that all fixed annuity transactions—including FIAs —should remain within the scope of PTE 84-24 and should not move into the BICE. AR042540–41. The IALC thus recognized that, by asking whether the proposed rule "strikes the right balance," the DOL was questioning whether the final rule should move all fixed annuity transactions out of PTE 84-24

---

[8]     Plaintiff suggests that defendants' citation to this comment is troubling because the National Association for Fixed Annuities has explained in other litigation against the DOL that the comment was prompted by an informal telephone conference it had with the DOL on the day before the comment period closed. Plaintiff asserts that the comment "only underscores the surreptitious manner in which the [DOL] chose to force its rule through." Doc. 36 at 15 n.2. Even if the court disregarded NAFA's comment for that reason, the other submitted comments show that other commenters discerned the possibility of the final rule change from the language of the proposed rule.

and into the BICE, even though the proposed rule provided that fixed annuity transactions would remain in PTE 84-24.

Advisors Excel's letter does not address this topic specifically.  Indeed, plaintiff describes Advisor Excel's letter as "not offer[ing] a focused or extensive discussion of" the issues that plaintiff raises in this lawsuit.  Doc. 53 at 3 n.2.  But Advisors Excel must have read the IALC's interpretation of the proposed rule because it concurred with many of the concerns outlined by IALC.  Yet Advisors Excel's comment was silent about this interpretation.  The court recognizes that the APA requires the agency to provide notice to interested parties—notice cannot come from one of the commenters.  *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (finding that comments suggesting the rule change were of "little significance" because "[c]ommenting parties cannot be expected to monitor all other comments submitted to an agency" and the agency "cannot bootstrap notice from a comment").  But IALC's letter shows that it anticipated the possibility of the final modification, and it argued against it in its comment—the same comment that Advisors Excel adopted in its comment.  This submission provides additional support for the conclusion that the final rule was a logical outgrowth of the proposed rule.

### d.  Public reaction does not demonstrate an APA violation.

Plaintiff also relies on the public's reaction to the final rule change to demonstrate insufficient notice.  Plaintiff contends that the press, state insurance regulators, and the industry all were shocked by the DOL's decision to remove FIAs from PTE 84-24.[9]  This surprise, plaintiff contends, shows that the public could not have anticipated the changes in the final rule,

---

[9]     Plaintiff asserts that the court may consider these materials, even though they are outside of the administrative record, because they constitute "evidence coming into existence after the agency acted [that] demonstrates that the actions were right or wrong."  *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1089 n.2 (10th Cir. 2004) (quoting *Am. Mining Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985)).

and thus the DOL's notice was insufficient.  But one also can interpret this "surprise" as resulting not from a lack of notice, but from a miscalculation about how the DOL would "draw the lines" when it decided which transactions would remain covered by PTE 84-24 and which would fall under the BICE in the final rules.  This kind of surprise fails to demonstrate insufficient notice.  *See Brazos Elec. Power Coop., Inc. v. Sw. Power Admin.*, 819 F.2d 537, 543 (5th Cir. 1987) (explaining that, although a member of the public "might have been surprised or disappointed by a particular allocation," it "provides no basis for claiming a statutorily deficient notice of rulemaking").  The court does not find the cited materials compelling evidence to demonstrate that the proposed rule failed to provide appropriate notice under the APA.

> **e.   Even if the DOL provided insufficient notice, it was harmless error because other commenters made the same comments that plaintiff says it would have asserted with proper notice.**

Finally, defendants assert that, even if the DOL's notice was insufficient, any violation of the APA was harmless because other commenters expressed concerns about removing FIAs from PTE 84-24.  Defendants contend that these are the same concerns that plaintiff claims it would have voiced during the public comment period had it received proper notice, and thus plaintiff can show no prejudice.

When a court reviews an agency action, the APA requires that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706.  The Tenth Circuit thus applies the harmless error rule when reviewing administrative proceedings.  *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993).  Under this rule, "errors in such administrative proceedings will not require reversal unless [a plaintiff] can show [it was] prejudiced."  *Id.*; *see also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (explaining that "[e]ven if a final rule were regarded objectively as an abrupt departure from a proposed rule, if parties directed

comments to such a denouement, it might well be properly regarded as a harmless error—

depending on how pointed were the comments and by who made"). In *Allina Health*, the District

of Columbia Circuit explained that if another member of the public makes a comment that was

"the same point that petitioner would press," any lack of notice "would still presumably be non-

prejudicial because all that is necessary in such a situation is that the agency had an opportunity

to consider the relevant views." 746 F.3d at 1110. Such is the case here.

    As described above, commenters urged the DOL to keep fixed annuities—including FIAs

—within the scope of PTE 84-24. *See*, *e.g.*, AR047030–31 (NAFA comment); AR042540–41

(IALC comment); *see also* AR042375–76 (stating in an earlier comment from NAFA that it

"applauds the [DOL] for recognizing the distinction between securities and insurance products"

and "agrees with the [DOL] that PTE 84-24 is the appropriate exemption to use for non-security

annuity contracts (i.e. fixed annuities)" because the requirements under the BICE are

inapplicable to non-security annuities).

    Plaintiff tries to nullify this conclusion by asserting that, if it had received sufficient

notice of the rule change, it would have provided data to the DOL about the final rule change's

effect on the independent distribution channel for FIAs. But the administrative record contains

information about this distribution channel. The IALC's comment specifically described the

distribution channels for fixed annuities, FIAs, and variable annuities. AR042535–66; *see also*

AR042541 (explaining in the IALC's comment why the products offered by IMOs are not

appropriate for treatment under the BICE framework); AR042545 (explaining in the IALC's

comment how the commission structure works between the insurance company, IMO, and

independent insurance agent); AR042547–48 (describing the "numerous operational and

procedural changes" that the new rule will impose on "insurance companies, insurance agents,

IMOs, broker-dealers, and registered investment advisers"). The DOL's final Regulatory Impact Analysis also discussed the independent distribution channel for the annuity market. AR000418–19. This discussion demonstrates that the DOL understood that annuities are sold through this channel, how this channel functioned under the existing regulations, and how it would operate under the new rules.

Plaintiff also contends that, had it received sufficient notice, it would have submitted comments to the DOL about the impracticability of including FIAs in the BICE. Other commenters made these same points in their comments to the DOL. *See* AR042376 (stating in a footnote in the earlier NAFA comment that the BICE is inapplicable to sales of non-securities annuities); AR042540–41 (stating in the IALC comment that the BICE is in applicable to fixed annuity products, including FIAs); AR047077 (same in a later IALC comment). Plaintiff also asserts that it would have provided data to the DOL showing that FIAs present no more risk, complexity, or conflicts of interest than fixed annuities. The record shows that IALC and NAFA submitted comments on these topics as well. *See*, *e.g.*, AR047030–41 (NAFA comment); AR047074–78 (IALC comment).

In sum, the administrative record shows that other commenters made the points that plaintiff contends it would have presented to the DOL had it received proper notice. Because the DOL received such comments, plaintiff sustained no prejudice. And, even if the notice was insufficient, the error was harmless. For all these reasons, the court concludes that plaintiff is not likely to prevail on its claim that the DOL violated the APA by providing insufficient notice that the final rule would remove FIAs from PTE 84-24.

## 2. Plaintiff is not likely to show that the DOL arbitrarily treated FIAs differently from all other fixed annuities.

Plaintiff next asserts that the DOL violated the APA because it is arbitrary and capricious to treat FIAs differently than all other fixed annuities.  Plaintiff contends that the DOL provided no reasoned basis for excluding FIAs from PTE 84-24 and moving them into the BICE while keeping other annuities (like declared rate annuities) under PTE 84-24.  Plaintiff argues that the DOL's distinction arbitrarily treats similar products differently.

An agency's action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Although a court cannot "supply a reasoned basis for the agency's action" if the agency has not provided one, the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* at 43–44 (first quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); then quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  Under this framework, a court will set aside the agency's "factual determinations only if they are unsupported by substantial evidence."  *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 704 (10th Cir. 2010) (quoting *Wyo. Farm Bureau Fed'n v. Babbit*, 199 F.3d 1224, 1231 (10th Cir. 2000)).

The court's review under the arbitrary and capricious standard "is narrow in scope, but is still a 'probing, in-depth review.'"  *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1221 (10th Cir. 2009) (quoting *Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222, 1229 (10th Cir. 2005)).

"An agency's action is entitled to a presumption of validity, and the burden is upon the petitioner to establish the action is arbitrary or capricious." *Id.* (citing *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008)).  When conducting its review, "[t]he court must rely upon the reasoning set forth in the administrative record and disregard post hoc rationalizations of counsel." *Id.* (citing *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994)).

Here, the DOL announced that it based its decision to exclude FIAs from PTE 84-24 on "the complexity, risk, and conflicts of interest associated with recommendations of variable annuity contracts, indexed annuity contracts and similar contracts."  Final PTE 84-24, 81 Fed. Reg. at 21,157–58.  A review of the administrative record shows that the DOL's determination is supported by substantial evidence.

First, the DOL determined that FIAs are "complex products requiring careful consideration of their terms and risks."  Final BICE, 81 Fed. Reg. at 21,018; Final PTE 84-24, 81 Fed. Reg. at 21,154.  For an investor to "assess[ ] the prudence of a particular indexed annuity[,]" one must have an understanding of:

> surrender terms and charges; interest rate caps; the particular market index or indexes to which the annuity is linked; the scope of any downside risk; associated administrative and other charges; the insurer's authority to revise terms and charges over the life of the investment; and the specific methodology used to compute the index-linked interest rate and any optional benefits that may be offered, such as living benefits and death benefits.

Final BICE, 81 Fed. Reg. at 21,018; Final PTE 84-24, 81 Fed. Reg. at 21,154.  Also, "[i]n operation, the index-linked interest rate can be affected by participation rates; spread, margin or asset fees; interest rate caps; the particular method for determining the change in the relevant index over the annuity's period (annual, high water mark, or point-to-point); and the method for

calculating interest earned during the annuity's term (e.g., simple or compounded interest)."
Final BICE, 81 Fed. Reg. at 21,018; Final PTE 84-24, 81 Fed. Reg. at 21,154.

Because of these characteristics, "[i]nvestors can all too easily overestimate the value of these contracts, misunderstand the linkage between the contract and index performance, underestimate the costs of the contract, and overestimate the scope of their protection from downside risk (or wrongly believe they have no risk of loss)." Final BICE, 81 Fed. Reg. at 21,018; Final PTE 84-24, 81 Fed. Reg. at 21,154. And, "[a]s a result, retirement investors are acutely dependent on sound advice that is untainted by the conflicts of interest posed by advisers' incentives to secure the annuity purchase, which can be quite substantial." Final BICE, 81 Fed. Reg. at 21,018; Final PTE 84-24, 81 Fed. Reg. at 21,154.

The Regulatory Impact Analysis supports these findings. It described how FIAs "provide crediting for interest based on changes in a market index" and why this makes them different "from [declared rate] annuities although both products are treated as exempt securities under current federal law." AR000435; *see also* Final PTE 84-24, 81 Fed. Reg. at 21,157 (quoting a FINRA publication that described FIAs as "anything but easy to understand"). The Regulatory Impact Analysis also explained that the selection of the crediting index "is an important, and often complex, decision." AR000435. And, the Regulatory Impact Analysis described how several methods exist "for determining changes in the index such as point-to-point, annual reset, high-water-mark, and low-water-mark." AR000439. The DOL recognized that "[b]ecause different indexing methods can result in varying rates of return, investors need to understand the trade-offs that they make by choosing a particular indexing method." *Id.* And, it explained that "[t]he rate of return is further affected by participation rates, cap rates, and the rules regarding interest compounding." *Id.*

The Regulatory Impact Analysis also described how FIA products may offer insurance features such as death benefits and guaranteed living benefits, which come in three types: (1) guaranteed minimum income, (2) guaranteed minimum accumulation, and (3) guaranteed minimum withdrawal (including lifetime withdrawal benefits). AR000435; *see also* AR000442 (comparing how this feature is "seldom" offered with declared rate annuities but was offered "with 84% of all new [FIA] sales in 2014"). "But these benefits may come at an extra cost and, because of their variability and complexity, may not be fully understood by the consumer." AR000435. These citations demonstrate that the DOL considered evidence about the complexity of FIAs.

Plaintiff disagrees with the DOL's conclusion. Plaintiff asserts that the DOL's conclusion is wrong because FIAs are no more complex than other annuity products. In its final rule, the DOL considered comments that expressed this view but, ultimately, rejected them. *See* Final PTE 84-24, 81 Fed. Reg. at 21,157 (discussing the comments that asserted that FIAs and declared rate annuities are similar investment products). The DOL instead relied on other evidence from the administrative record to reach the opposite conclusion—that FIAs are more complex financial products. Because this decision is supported by evidence within the administrative record, the court must defer to the DOL's decision. *See Forest Guardians*, 611 F.3d at 704 (explaining that a court cannot "displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it" (citation and internal quotation marks omitted)).

Second, the DOL concluded that FIAs pose risks that require more stringent regulation under the BICE instead of PTE 84-24. To reach this conclusion, the DOL described the risks

involved with FIAs that make them more like variable annuities and different from declared rate

annuities.  They include:

> [T]he insurance company bears the investment risk in a [declared rate] annuity, because the insurer guarantees a minimum interest rate at the beginning of crediting period.  In contrast, in a variable annuity, the investment risk is borne by the contract owner because the account value fluctuates based on the performance of underlying funds.  Fixed-indexed annuities fall between [declared] rate annuities and variable annuities in terms of the extent to which insurers bear investment risks. In fixed-indexed annuities, insurers generally guarantee at least a zero return.  However, as long as the return is above the minimum guarantee, the actual return on a fixed-indexed annuity is not determined until the end of the crediting period and is based on the performance of a specified index or other external reference.  Similar to variable annuities, the returns of fixed-indexed annuities can vary widely, which results in a risk to investors.  Furthermore, insurers generally reserve rights to change participation rates, interest caps, and fees, which can limit the investor's exposure to the upside of the market and effectively transfer investment risks from insurers to investors.

AR000439; *see also* AR000440–42 (chart comparing the features and risk involved with

declared rate annuities, fixed-indexed annuities, and variable annuities).

The DOL also recognized that FINRA and the SEC have concluded that FIAs present

more risks than declared rate annuities.  FINRA has stated that FIAs "give you more risk (but

more potential return) than a fixed annuity but less risk (and less potential return) than a variable

annuity."  AR000600 (internal quotation marks omitted).  And, the SEC has explained:

> You can lose money buying an indexed annuity.  If you need to cancel your annuity early, you may have to pay a significant surrender charge and tax penalties.  A surrender charge may result in a loss of principal, so that an investor may receive less than his original purchase payments.  Thus, even with a specified minimum value from the insurance company, it can take several years for an investment in an indexed annuity to break even.

*Id.* (internal quotation marks omitted).

Finally, the DOL determined that sales of FIAs involve more conflicts of interest than sales of other types of fixed annuity products. The DOL explained, "[T]he increasing complexity and conflicted payment structures associated with [FIA] products have heightened the conflicts of interest experienced by investment advice providers that recommend them." Final PTE 84-24, 81 Fed. Reg. at 21,154. It cited the Regulatory Impact Analysis, which found that "conflicts of interest in the marketplace for retail investments result in billions of dollars of underperformance to investors saving for retirement." *Id.*; *see also* AR000465–74; AR000483. The DOL thus concluded that "[b]oth categories of annuities, variable and indexed annuities, are susceptible to abuse, and all retirement investors—plans and IRAs alike—would benefit from a requirement that advisers adhere to enforceable standards of fiduciary conduct and fair dealing." Final PTE 84-24, 81 Fed. Reg. at 21,154. The Regulatory Impact Analysis also concluded: "If anything, the potential harm from conflicts of interest would be larger in the annuity market because purchasers of annuities are often older individuals who are less sophisticated in financial matters than the purchasers of commercial property-casualty insurance." AR000438.

The administrative record establishes that the DOL was presented with conflicting viewpoints: "[O]ne commenter noted that the compensation structure for indexed annuities is similar to that of variable annuities, raising comparable concerns regarding conflicts of interest." Final PTE 84-24, 81 Fed. Reg. at 21,157. Because of this, commenters suggested that the sale of FIAs "should be subject to the same protective conditions as those proposed for variable annuities under the BICE." *Id.*

Also, the administrative record contains evidence showing that commissions for FIAs typically exceed those for other products, including declared rate annuities. *See* AR000447 (stating that "[c]ommissions on indexed annuities average 6.3 percent of the principal

payment"); *see also* AR046849 (describing in a comment from Fund Democracy how indexed and variable annuities raise similar conflicted compensation issues and stating that "the compensation paid to advisers for selling indexed annuities may vary from and is typically higher than the compensation received for sales of other products, which means that advisers may have an incentive to recommend them solely on the basis of the relative compensation received"). The DOL concluded that "[s]uch high and variable commissions can encourage agents and brokers to recommend products that are not suitable for their customers and/or to favor one suitable product over others that would better serve their customers' interests." AR000447.

Plaintiff argues that the evidence does not support these conclusions. It claims that commission rates for FIAs are actually lower than other insurance products. It cites the Regulatory Impact Analysis, which states that "[c]ommissions on indexed annuities average 6.3 percent of the principal payment" while "aggregate commission payments accounted for 7 percent of aggregate total expenses and amounted to 9 percent of total premiums in 2013." Doc. 36 at 20 (citing AR000447). But, in that same section, the DOL cited evidence showing that "U.S. sales commissions on annuities were about 4% of premiums." AR000447. The court recognizes that a rational person could reach conflicting conclusions from this data. But the governing law is clear. It is not the court's role to decide the proper way to interpret the data—it must leave that decision to the agency. *See Forest Guardians*, 611 F.3d at 704 (explaining that a court cannot "displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it" (citation and internal quotation marks omitted)).

Plaintiff also asserts that the amendment to PTE 84-24 was unnecessary because FIAs already are governed, appropriately, by state insurance laws.  But, the DOL specifically addressed this argument in the final rule.  It recognized that "[a] number of commenters objected generally to changes to PTE 84-24 on the basis that the original exemption, in combination with other regulatory safeguards under insurance law or securities law, provides sufficient protections to plans and IRAs."  Final PTE 84-24, 81 Fed. Reg. at 21,153.  Thus, commenters asserted, the current rules do not expose consumers to demonstrated harms.  *Id.*  The DOL did not agree.  *Id.*  It explained:

> The extensive changes in the retirement plan landscape and the associated investment market in recent decades undermine the continued adequacy of the original approach in PTE 84-24.  In the years since the exemption was originally granted in 1977, the growth of 401(k) plans and IRAs has increasingly placed responsibility for critical investment decisions on individual investors rather than professional plan asset managers.  Moreover, at the same time as individual investors have increasingly become responsible for managing their own investments, the complexity of investment products and range of conflicted compensation structures have likewise increased.  As a result, it is appropriate to revisit and revise the exemption to better reflect the realities of the current marketplace.

*Id.*

Plaintiff argues, however, that the administrative record lacks evidence of conflicted or abusive sales practices to warrant the new regulation.  Plaintiff relies on data that, it contends, shows an absence of complaints about FIA transactions, which must mean that such transactions are not subject to abuse.  Indeed, in 2015, only 52 of all 3,994 life insurance and annuity complaints involved FIAs.  Doc. 11-2 ¶ 19.  But, as the DOL explained, FIAs are likely to involve complex fee arrangements that make conflicts of interest and other abuses difficult for consumers to discern.  AR000435; *see also* AR000439 (explaining that the complexity of FIAs

makes investors "acutely dependent on financial advice they receive from broker-dealers and insurance agents" and renders "[u]nbiased and sound advice . . . even more crucial in guarding the best interests of investors in fixed-indexed annuities").  One commenter also criticized complaint data as unrepresentative of abusive practices because, with opaque transactions, consumers lack the information to complain.  AR031685.  So, it is reasonable to conclude that consumers will lodge fewer complaints about FIAs than other types of transactions if they are unaware of the potential for conflicts or abuse.  And, it was reasonable for the DOL to conclude that FIAs thus require additional regulation beyond the existing state laws to protect consumers from this potential for conflicted advice.

Also, plaintiff contends that the DOL has committed the same error that the SEC did when it tried to regulate FIAs without adequately considering whether existing state law provided sufficient protections.  *See Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 178–79 (D.C. Cir. 2010).  In that case, the court invalidated the SEC's final action because it determined that the SEC had violated a provision of the Securities Act of 1933 requiring the SEC when "engaged in rulemaking . . . to consider or determine whether an action is necessary or appropriate in the public interest . . . [and for] the protection of investors [and] whether the action will promote efficiency, competition, and capital formation."  *Id.* at 176–77 (citing 15 U.S.C. § 77b(b)).  But plaintiff cites no similar statutory requirement that the DOL must follow when engaging in rulemaking of this kind.  And, thus, *American Equity Investment* has no persuasive value here.[10]

---

[10]      The court's other holding in *American Equity Investment*, however, supports the DOL's conclusions about treating FIAs differently than declared rate annuities.  In the same opinion, the District of Columbia Circuit held that the SEC reasonably interpreted the term, "annuity contract," as excluding FIAs under the *Chevron* test.  613 F.3d at 172–76 (citing *Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)).  That court described FIAs as "hybrid financial product[s] that combine[ ] some of the benefits of fixed annuities with the added earning potential of a security."  *Id.* at

And, even if plaintiff could point to a similar statutory prerequisite, the administrative record shows the DOL considered comments urging for more regulation "to enhance retirement investor protection in an area lacking sufficient protections for investors in tax qualified accounts."  Final PTE 84-24, 81 Fed. Reg. at 21,157.  Indeed, one commenter argued that "IRA owners need greater protections when investing in index annuities precisely because such products are not regulated securities."  *Id.*  The DOL also considered comments that described the role of state insurance regulators and recognized the shared regulatory responsibility that state insurance regulators have with federal agencies.  Final Fiduciary Definition, 81 Fed. Reg. at 20,959.  The DOL also met with the National Association of Insurance Commissioners to ensure that the federal and state laws governing consumer protection in this area are consistent and compatible.  *Id.* at 20,960.  And, the DOL considered comments expressing concern that the proposed rule would interfere with state insurance regulatory programs and that it ignored the role that state insurance regulators play in protecting consumers.  Final BICE, 81 Fed. Reg. at 21,018.  The DOL "[did] not agree with these comments," citing its meetings with state insurance regulators, its review of model state insurance laws, and its commitment to ensuring that the final rule complimented and did not conflict with state insurance regulations.  *Id.* at 21,018–19.

In sum, the court concludes that the DOL provided a reasoned explanation for its decision to move FIAs from the scope of PTE 84-24, and thus the DOL's final rule is not arbitrary and capricious.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (explaining

---

168.  It also explained that FIAs "appeal to the purchaser not on the usual insurance basis of stability and security but on the prospect of growth through sound investment management."  *Id.* at 174 (citation and internal quotation marks omitted).  And, like securities, FIAs involve "a variability in the potential return that results in a risk to the purchaser."  *Id.*  The District of Columbia Circuit thus concluded that all these characteristics of FIAs "involve considerations of investment not present in the conventional contract of insurance."  *Id.* (citation and internal quotation marks omitted).

that an agency decision is not arbitrary and capricious if the agency provides adequate reasons for its decision); *see also Nat'l Ass'n for Fixed Annuities*, 2016 WL 6573480, at *34–35 (concluding that the DOL provided a reasoned explanation for its decision to move FIAs out of PTE 84-24 and into the BICE and thus did not violate the APA).

> **3.   Plaintiff is not likely to prove that the DOL failed to consider the detrimental effects of its actions on independent insurance agent distribution channels.**

Plaintiff also contends that the DOL violated the APA and RFA by failing to consider the economic impact that the final rule would impose on independent insurance agent distribution channels (including independent insurance agents, IMOs, and other business like Market Synergy that support the distribution channel). The administrative record belies this assertion.

The Regulatory Impact Analysis described the various roles that insurers, insurance agents, and intermediaries such as IMOs play in the independent distribution channel. AR000416–21. It also recognized that "in the indexed annuity market insurers heavily rely on independent insurance agents." AR000420. When discussing the existence of conflicts, the Regulatory Impact Analysis analyzed the distribution channel, providing data about the amount of sales of each type of annuity through various channels. AR000447. It also expressed concern that "potential conflicts affecting insurance intermediaries are likewise varied, complex, and difficult for consumers to discern." AR000460.

The Regulatory Impact Analysis also addressed the effect the rule changes could have on the independent distribution channel. It considered the costs that insurers will incur for complying with the rule and exemptions. AR000553–54. It also recognized that "[i]ndependent insurance agents could be affected" by the rule changes, and that insurers may impose some of their incurred costs on independent agents. AR000554. The DOL was mindful that its analysis

may not account for costs for independent insurance agents.  *Id.*  But the DOL also explained

that it lacked sufficient data and the industry had declined to provide that information even

though the DOL requested it.  *Id.* at n.519; *see also* Doc. 41-1 at 50.  But, "to the extent insurers

provided support some costs could be accounted for in the total costs for insurers."  AR000554 at

n.519.[11]

The Regulatory Impact Analysis further concluded that the final rule "will . . . impose

costs on small service providers rendering investment advice to plan or IRA investors . . .

includ[ing] . . . insurance companies and agents . . . and others providing investment advice to

plan and IRA investors."  AR000570.  And, it recognized that independent insurance agents and

IMOs will face choices about how best to respond to the new rule and its exemptions.

AR000626–27.  It predicted that firms "will gravitate toward structures and practices that

efficiently avoid or manage conflicts to deliver impartial advice consistent with fiduciary

conduct standards."  AR000626.  And the DOL's analysis noted that "[f]irms that achieve these

ends most efficiently will gain market share."  *Id.*

In the final rule, the DOL addressed the effect the amendments would impose on the

distribution channel.  The DOL recognized that "marketing or distribution affiliates and

intermediaries" would not meet the definition of "Financial Institution" allowing them to operate

under the BICE.  Final BICE, 81 Fed. Reg. at 21,067.  But, the DOL explained that the final rule

---

[11]       This analysis shows, plaintiff argues, that the DOL only considered the rule's effect on insurance
companies, not independent insurance agents or IMOs, thus violating the APA and RFA.  The court
disagrees.  The cited portions of the administrative record show that the DOL analyzed the economic
impact on independent insurance agents using the data that the industry made available.  Plaintiff cites no
authority requiring the DOL to engage in a more specific analysis under the APA.  The DOL's actions
also satisfied the requirements of RFA.  *See N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62,
96 (D.D.C. 2007) (explaining that the RFA does not require "mathematical exactitude" but only a
"reasonable, good-faith effort" to carry out the RFA's mandate (citations and internal quotation marks
omitted)).  Indeed, the court is persuaded that the DOL performed a final regulatory flexibility analysis
that fulfilled the RFA's requirement.  *See* 5 U.S.C. §§ 603–04; *see also* Final Fiduciary Definition, 81
Fed. Reg. at 20,993–94; Final BICE, 81 Fed. Reg. at 21,074–75; AR000570–76.

permits these entities to qualify for an individual exemption to bring them within the "Financial Institution" definition.  *Id.*  The DOL also recognized that commission payments may pass through intermediaries, and it explained that it did not intend "to disrupt the practice of paying commissions through a third party, such as an independent marketing organization."  Final PTE 84-24, 81 Fed. Reg. at 21,166.

While recognizing these effects that the new rule and related exemptions may impose on the independent distribution channel, the DOL also found that its rulemaking would produce significant benefits for consumers.  *See* AR000642–44; *see also* AR000625 ("The underperformance associated with conflicts of interest—in the mutual funds segment alone— could cost IRA investors between $95 billion and $189 billion over the next 10 years and between $202 billion and $404 billion over the next 20 years" but "[t]he [DOL] estimates that the final rule and exemptions, by mitigating this particular type of adviser conflict, have the potential to produce gains for IRA investors [in the front-end-load mutual fund segment alone] worth between $33 billion and $36 billion over 10 years and between $66 and $76 billion over 20 years."); Final Fiduciary Definition, 81 Fed. Reg. at 20,949 (recognizing that the rule changes were warranted because, under the existing rules, "[a]n ERISA plan investor who rolls her retirement savings into an IRA could lose 6 to 12 and possibly as much as 23 percent of the value of her savings over 30 years of retirement by accepting advice from a conflicted financial adviser").  Weighing these burdens against the estimated benefits, the DOL concluded that "any frictional cost associated with this final rule and exemptions will be justified by the rule's intended long-term effects of greater market efficiency and a distributional outcome that favors retirement investors over the financial industry."  AR000625.

The DOL also found that entities within the independent distribution channel could adapt to the changes.  The DOL described the "markets for financial advice, financial products and other financial services" as "highly dynamic" ones.  *Id.*  It predicted that "advisers may migrate from advisory firms where conflicts had been most deeply embedded to firms that are well-situated to efficiently provide impartial advice compliant with the final rule and exemptions."  AR000627.  And, this would lead to "greater long-term efficiency, with a more efficient allocation of labor and other resources to investment advice and other productive enterprises."  *Id.*  The DOL also relied on data from the United Kingdom after it implemented regulatory changes banning commissions.  From this data, the DOL predicted it is unlikely that the rulemaking will cause advisers to leave the market or otherwise adversely affect consumers' access to investment advice.  AR000393–94.

Plaintiff also contends that the DOL's analysis is flawed because it never evaluated whether the independent distribution channel can operate under the BICE.  And, plaintiff asserts, the BICE is unworkable for IMOs and independent agents.  Defendants disagree.  They identify several ways IMOs can continue to operate under the BICE.

First, IMOs could retain their current role providing support to independent insurance agents while insurers can serve as the "Financial Institution" under the BICE.  Final BICE, 81 Fed. Reg. at 21,003.  That is, the insurer must sign the contract acknowledging its fiduciary status and commit to adhere to certain standards of conduct.  *Id.* at 21,003, 21,076–79.  Plaintiff claims that this is not a viable option because some insurers have expressed an unwillingness to take on the role and responsibilities of a "Financial Institution" under the BICE.  But, even one of plaintiff's declarants recognizes that other insurance companies may "continue to use independent agents and agree to sign the [contract] as a Financial Institution in those

transactions" but "may decide to eliminate the IMO." Doc. 11-7 ¶ 21. Under this scenario, the BICE is not unworkable. True, it may disadvantage the IMO; but as defendants' counsel explained at oral argument, the DOL need not guarantee that plaintiff and its members will do well under the new system. Doc. 54 at 126 (Tr. 126:15–25). Instead, the APA only requires that the DOL consider the issue and provide a reasoned basis for its decision. *Id.* The DOL satisfied these requirements. *See* AR000625–27.

Plaintiff also argues that, unless a large number of insurers elect to serve as the "Financial Institution," insurance agents will have access to a limited number of products and thus cannot recommend the most suitable form of annuity to prospective investors. But the rule makes it clear: The BICE "does not impose an unattainable obligation on Advisers and Financial Institutions to somehow identify the single 'best' investment for the Retirement Investor out of all the investments in the national or international marketplace, assuming such advice were even possible." Final BICE, 81 Fed. Reg. at 21,029.

Second, insurers or individual agents could affiliate with a broker-dealer, as some of them have done already. Indeed, as discussed at oral argument, some 35% of independent insurance agents already are licensed to handle securities. Doc. 54 at 47, 128 (Tr. 47:1–5, 128:1–11). This is another way for independent insurance agents to operate under the BICE.

Third, IMOs may seek individual exemptions to come within the definition of "Financial Institutions" under the BICE. Final BICE, 81 Fed. Reg. at 21,067. In its rulemaking, the DOL specifically considered comments requesting that the DOL include marketing or distribution intermediaries within the definition of "Financial Institution." *Id.* The DOL declined these requests and, instead, provided these entities with an option to seek an exemption. *Id.* Indeed, plaintiff concedes this option exists, and also concedes that three of plaintiff's IMOs already

have applied for such exemptions.  *See* Doc. 25-1 at 90–106 (Financial Independence Group); Doc. 49-1 at 3–19, 38–57 (applications submitted by Advisors Excel and Brokers International).

Plaintiff asserts that the exemption process is uncertain, and it may prove lengthy and costly.  For "marketing intermediaries or other entities" to obtain an exemption, they must submit an application to the DOL with "information regarding their role in the distribution of financial products, the regulatory oversight of such entities, and their ability to effectively supervise individual Advisers' compliance with the terms of this exemption."  Final BICE, 81 Fed. Reg. at 21,067.  Plaintiff asserts that it cannot supervise individual advisers effectively without expanding its current business model at a substantial cost and with no assurances that the DOL will grant an exemption.  The court realizes that the rulemaking may require plaintiff to make changes to its business, but no doubt can exist that the new regulations provide this option. This scenario is not something that the DOL failed to consider.  *See* AR000626–27 (recognizing that independent insurance agents and IMOs "will face choices about how to respond to this final rule and exemptions").  To the contrary, the DOL recognized the changes that the new rule and exemptions would impose, and it provided alternative options for entities engaged in the distribution channel to pursue.  This satisfies the APA's requirements.

In sum, the DOL considered the effect the rulemaking may impose on the independent distribution channel.  It recognized that the rulemaking will impose costs on the industry and require its participants to make changes.  But the DOL also cited evidence showing that the new rule and exemptions will benefit retirement investors by protecting them from the potential for conflicted advice.  The DOL weighed these costs and benefits of the rule changes, ultimately deciding that the benefits to investors outweighed the costs to those in the independent distribution channel.  Another court recently observed this tension, noting "[t]his is not an easy

balance to strike." *Nat'l Ass'n for Fixed Annuities*, 2016 WL 6573480, at *39.  But, under the APA, "[t]he only question for the [c]ourt . . . is whether the [DOL's] decision was a reasonable one," and the court cannot "substitute its judgment [for] that of the [DOL] regarding matters of policy and not law." *Id.*

After reviewing the administrative record, the court is able to discern the DOL's path in its rulemaking.  *See Motor Vehicle Mfrs. Ass'n of the U.S.*, 463 U.S. at 43 (instructing courts to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").  The DOL recognized the effects that the final rule would have on the industry's players but concluded that the need to protect consumers from conflicted investment advice outweighed those concerns.  The DOL's decision was a reasonable one.  The DOL's action did not violate the APA.  *See Nat'l Ass'n for Fixed Annuities*, 2016 WL 6573480, at *39 (holding that the DOL acted lawfully when it removed FIAs from PTE 84-24 and subjected them to the requirements of the BICE).

### 4. Plaintiff is not likely to show that the DOL exceeded its statutory authority by seeking to manipulate the financial product market instead of regulating fiduciary conduct.

In its briefing, plaintiff's last argument contends that the DOL exceeded its statutory authority by issuing the final rule.  Plaintiff's briefs argue that the DOL has engaged in preferential treatment by including some retirement investment products in PTE 84-24 while subjecting other products to the more stringent requirements of the BICE.  Plaintiff contends that the DOL lacks statutory authority to regulate financial products and, with the final rule, it has manipulated access to particular financial products.  This, plaintiff asserts, exceeded the authority Congress has delegated to the agency under ERISA and the IRS Code.

At oral argument, though, plaintiff appeared to abandon this argument. *See* Doc. 54 at 21, 24–25 (Tr. at 21:6–22, 24:21–25:14). But, even if plaintiff has not conceded this argument, it is not likely to succeed on it. Congress has delegated authority to the DOL to grant "a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the" prohibited transactions restrictions under ERISA. 29 U.S.C. § 1108(a); *see also* 29 U.S.C. § 4975(c)(2) (establishing an exemption procedure for tax-favored plans under the IRS Code). To grant an exemption, the Secretary of the DOL must conclude that it is: "(A) administratively feasible, (B) in the interests of the plan and of its participants and beneficiaries, and (C) protective of the rights of participants and beneficiaries of the plan." 29 U.S.C. § 1108(a); 29 U.S.C. § 4975(c)(2). When issuing the final rule, the DOL applied this statutory standard and concluded that the exemptions satisfied the requirements established by Congress. *See, e.g.*, Final PTE 84-24, 81 Fed. Reg. at 21,173–74; Final BICE, 81 Fed. Reg. at 21,009, 21,059–61; AR000605.

When Congress has authorized an agency to grant exemptions, the agency's actions are entitled to great deference. *See AFL-CIO v. Donovan*, 757 F.2d 330, 341 (D.C. Cir. 1985) (stating that when Congress "expressly delegate[s] the authority to grant the exemption and . . . to make certain other determinations in order to do so . . . [t]hat grant and those determinations have legislative effect [and] are thus entitled to great deference"). Such is the case here. Congress has granted the DOL the authority to issue the exemptions found in the final rule, and the court must defer to those determinations.

To the extent plaintiff argues that the DOL's conclusions are unsupported, the court already has addressed this argument in the sections above. The court concludes that the DOL's

reasoning was neither arbitrary nor capricious, and thus plaintiff is not likely to show that the agency violated the APA or RFA by issuing the final rule.

### B.  Irreparable Harm

Because the court concludes that plaintiff has not carried its burden to demonstrate it is likely to succeed on the merits, plaintiff has not shouldered its burden for injunctive relief. Nevertheless, the court briefly considers the other requisites of a preliminary injunction and concludes that plaintiff has not satisfied them either.  The court begins this additional analysis with the irreparable harm requirement.

A plaintiff establishes irreparable harm by demonstrating "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  A claim of "purely speculative" harm will not suffice. *Id.*  Instead, a plaintiff must show that "significant risk of irreparable harm" is present to meet the burden.  *Id.* (quoting *Greater Yellowstone*, 321 F.3d at 1260).  Moreover, wholly conclusory statements do not amount to irreparable harm.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004).  The court also must determine if the harm is likely to take place before a ruling on the merits.  *RoDa Drilling Co.*, 552 F.3d at 1210.

Here, plaintiff asserts that the DOL's rulemaking will have profound consequences because, in effect, it prohibits those who sell or are involved in the independent distribution of FIAs from receiving commissions or other third-party compensation under PTE 84-24 (because the rule revokes that exemption) or the BICE (because, it contends, that exemption is unworkable).  Plaintiff claims that the rule changes will shift how FIAs are sold and who will sell

them.  It also asserts that the rule changes will alter the annuity industry radically, and to the overwhelming detriment of independent agents, IMOs, and plaintiff.

Plaintiff anticipates that the new rule will force insurance companies to move their sales of FIAs away from independent agent distribution and shift their distribution to career agents, banks, registered investment advisers, and broker-dealers.  This shift will injure plaintiff, IMOs, and independent agents through loss of customers, market share, goodwill, and competitive position relative to broker-dealers, banks, registered investment advisers, and captive agent sales forces.  Plaintiff expects that independent agents and IMOs will experience a revenue decline exceeding 50%.  Plaintiff also anticipates its revenue dropping by almost 80%.  And plaintiff forecasts that more than 20,000 independent insurance agents will leave the marketplace. Plaintiff asserts that consumers will sustain injury as well because, currently, independent agents offer financial advice tailored to specific consumers at no cost.  But, without compensation from the sale of FIAs, independent agents will lack the financial capacity to offer free investment advice.  This, plaintiff asserts, will preclude these agents from offering free advice to less affluent customers.

Defendants contend that plaintiff's assertions of irreparable harm are speculative because they assume that insurance companies will respond to the new regulations in a particular fashion. The court agrees.  Speculation about how third parties will react to the new rule is insufficient to demonstrate irreparable harm.  *See, e.g.*, *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 78–79 (D.D.C. 2013) (holding that

plaintiffs' assertions about "what they truly 'expect' to happen in the marketplace; what their customers are 'likely' to demand; and what 'could' happen to their businesses" under a new agency rule was speculative and not a showing of actual or certain harm required for injunctive relief); *Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) (concluding that "a probable loss in market share . . . does not amount to irreparable harm").

Moreover, to make the required showing here, plaintiff must rely on its allegation that the BICE is unworkable. But the court already rejected that assertion. To the contrary, the DOL has provided plaintiff several options to operate under the BICE, including applying for an exemption to come within the definition of "Financial Institution"—an option that three of plaintiff's IMOs already are pursuing. Plaintiff thus cannot show irreparable harm when it has several other ways it can continue its business operations under the new rule and exemptions.

Another shortcoming in plaintiff's irreparable harm theory is that it relies on the actions of third parties. That is, plaintiff contends that it will sustain injury because insurance companies may change the way they do business in light of the rule change. Other courts have determined that such indirect causation of injury is insufficient to establish irreparable harm because the injury flows from third parties, not the rule itself. *See Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36–37 (D.D.C. 2014) (holding that plaintiff could not establish irreparable harm to economic interests because any revenue losses resulted from independent decisions made by third parties, and not from the rule change directly); *see also Am. Meat Inst.*, 968 F. Supp. 2d at 80–81 (concluding no irreparable harm established when the harm "does not flow directly from the requirements of the Final Rule but is instead based on independent market variables such as how the supplier's customers and/or retail consumers might react" and concerns that plaintiffs "will ultimately lose future business because others may respond to the new . . . rules and react in a

manner that may ultimately affect their companies negatively" is an "indirect harm [that] is neither certain nor immediate").  And, as defendants recognize, even if the court issued the requested injunctive relief, it is not binding on insurance companies.  Such relief thus would provide no assurances that the insurance companies will modify their behavior based on the court's ruling.  In sum, plaintiff has not established irreparable harm here.

### C.  Balance of Harms and Public Interest

Last, the court considers whether plaintiff has shown that "the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Plaintiff asserts that a preliminary injunction will harm no governmental or public interest because the DOL has no legitimate interest in issuing or enforcing an invalid regulation.  But, as the court concluded above, plaintiff is not likely to show that the DOL has violated the APA or RFA in its rulemaking.

Also, plaintiff argues that the DOL's amendment to and partial revocation of PTE 84-24 applies only to transactions occurring on or after April 10, 2017, so the government will not sustain harm if an injunction is issued now.  The court disagrees.  As defendants argue, an injunction will lead to confusion about the law and likely produce unwarranted delay.  This is not in the public's interest.  Any injunction thus will produce a public harm that outweighs any harm that plaintiff may sustain from the rule change.  The DOL has determined that the rule changes will benefit retirement investors throughout the United States by requiring investment advisers to act in the best interest of those investors.  Congress authorized the DOL to evaluate these competing interests and it has concluded that significant public interests favor the proposed regulatory changes.  As already explained, evidence in the administrative record supports the DOL's determination and the court finds no basis for contradicting those findings.

## V.    Conclusion

Plaintiff has not shouldered its burden to establish the four requirements for a preliminary injunction.  The court thus denies plaintiff's Motion for Preliminary Injunction.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the plaintiff's Motion for Preliminary Injunction (Doc. 10) is denied.

**IT IS SO ORDERED.**

**Dated this 28th day of November, 2016, at Topeka, Kansas.**

<u>**s/ Daniel D. Crabtree**</u>
**Daniel D. Crabtree**
**United States District Judge**